**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 23-cr-00302-NYW-2

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.    MICHAEL VERGATO,

      Defendant.

_____

**GOVERNMENT'S SENTENCING STATEMENT
AS TO DEFENDANT MICHAEL VERGATO**

_____

For more than six years, defendants Michael Vergato and Mark Perlstein worked together to steal nearly $2 million from Datavail Corporation ("Datavail"). To maintain the lucrative scheme they established, the defendant helped create fraudulent statements of work ("SOWs") and invoices billing for tens of thousands of hours of performance tuning that his company, Oracle Performance Tuning & Optimization LLC ("OPTO"), was purportedly completing for Datavail. He hid his involvement in the scheme by utilizing his stepdaughter's identity to send emails, sign contracts, and negotiate checks. The defendant spent his cut of the fraud proceeds by buying two BMWs and creating retirement accounts for himself and his wife.

Considering the scope, duration, and serious nature of the defendant's crimes, only a substantial prison sentence will serve the demands of justice. Subject to review of the Presentence Investigation Report and consideration of forthcoming victim impact

information, the government anticipates that it will recommend a sentence of not less than 78 months' imprisonment, the maximum three-year term of supervised release, and restitution to be calculated and presented to the Court prior to sentencing.

## I.     FACTS ESTABLISHED AT TRIAL

On May 27, 2025, a jury convicted the defendant of six counts of wire fraud after a six-day jury trial.  The facts established at trial are summarized below.

### A.     Background

Arrow Electronics is a Fortune 150 company based in Centennial, Colorado.  It specializes in the distribution of electronic components and related services.  From at least 2010 through 2020, the defendant worked for Arrow Electronics in a variety of technical roles, ultimately being promoted to the Chief Technology Officer.  In this role, he completed and oversaw the completion of, *inter alia*, performance tuning services for Arrow's Oracle EBS databases, both directly and in conjunction with various contractors, including Datavail.  As the defendant was promoted, he assumed more direct control over Arrow's relationship with Datavail.  He maintained that status until his termination in the summer of 2020.

From 2010 through 2020, Perlstein worked as the Chief Executive Officer of Datavail, a Broomfield, Colorado-based data management software provider that helps clients build and manage applications.  Shortly after Perlstein joined Datavail, Arrow—Datavail's largest client at the time—informed Datavail that it was considering dropping or cutting back Datavail's services.  This could have been disastrous for Datavail.  In response, Perlstein assumed substantial responsibility over the Arrow contract and

began working closely with the defendant.  Perlstein maintained oversight of the Arrow contract until his termination in January 2020.

During their professional relationship, the defendant began complaining to Perlstein about his substantial workload, which included performance tuning work, and what he viewed as his own inadequate compensation from Arrow.  According to Perlstein, the defendant indicated he was able to fix the Datavail/Arrow relationship, but he would not do it for free.  Ultimately, in or around 2013, the defendant and Perlstein came up with a scheme to bill Datavail for performance tuning services purportedly to be completed by OPTO for Arrow and thereafter split the proceeds.  Around that time, SOW 11 was negotiated between Arrow and Datavail.  It provided that Datavail would deliver four Tier IV performance tuners to provide services for Arrow.  (Ex. 132.)  SOW 11 became a mechanism which both covered for and facilitated the fraudulent relationship between OPTO and Datavail.

The defendant also had the ability to protect Datavail from within Arrow and ensure that Arrow's complaints about Datavail's performance tuning services lessened.  Indeed, Perlstein testified that after the scheme began, Arrow's complaints regarding Datavail's performance tuning services lessened substantially.

### B.    The Defendant's Scheme to Defraud

In November 2013, the defendant incorporated OPTO with the New York Department of State.  (Exs. 4 & 223.)  He then established a Suffolk Federal Credit Union account for OPTO, which he controlled.  (Ex. 223.)  Thereafter, for more than six years, the defendant and Perlstein executed the sophisticated scheme to defraud

through numerous intentional falsehoods, misrepresentations, and omissions, resulting in nearly $2 million of payments from Datavail to OPTO.

**(1)     The defendant used his stepdaughter's identity to conceal his involvement in the fraud.**

To conceal his involvement in the scheme and avoid detection by Datavail or Arrow, the defendant approached his stepdaughter with a request to use her identity to conduct business on behalf of OPTO.  She agreed, although she testified at trial that she did no work for OPTO, did not control the email account created in her name, received no salary or profit, and only signed a couple of documents at the defendant's request.

The defendant listed his stepdaughter as OPTO's "Director of Operations" or "Vice President" on various documents. He then used her identity to: set up OPTO as a Datavail vendor; transmit invoices and payment instructions to Datavail; sign SOWs; and negotiate checks.  He further corresponded with Perlstein about OPTO using her identity and an email account set up in her name: c_vicari@oracleperformancetuning.net.  (*See, e.g.*, Exs. 11, 14, 223.)

**(2)     The defendant and Perlstein created fraudulent contracts and invoices.**

From January 2014 through at least August 2019, the defendant and Perlstein created 21 fraudulent SOWs between Datavail and OPTO, in which OPTO agreed to provide "EBS Database performance tuning consulting services" for Datavail.  Both the SOWs and associated invoices falsely provided that OPTO would provide performance tuning support with the total contract price determined based on the applicable hourly

rate and the number of hours of work listed in the contract.

| Statement of Work Number | Scope of Performance Tuning Services[1] | Hourly Rate | Amount Paid by Datavail (Exs. 161 & 180) |
|---|---|---|---|
| 1 (Ex. 16) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 2 (Ex. 20) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 3 (Ex. 31) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 4 (Ex. 37) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 5 (Ex. 42) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 6 (Ex. 47) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 7 (Ex. 53) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 8 (Ex. 59) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 9 (Ex. 64) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 10 (Ex. 69) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 11 (Ex. 74) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 12 (Ex. 78) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 13 (Ex. 82) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $69,984 |
| 14 (Ex. 86) | 3 FTEs for 3 months (480 hours/month) | $54/hour | $63,984 |
| 15 (Ex. 92) | Part 1: 3 FTEs for 3 months (480 hours/month)<br><br>Part 2: 400 hour project at fixed fee of $24,000 | $60/hour | $93,984 ($69,984 for Part 1 & $24,000 for Part 2) |
| 16 (Ex. 99) | 3 FTEs for 6 months (480 hours/month) | $66/hour | $152,064 |
| 17 (Ex. 103) | 3 FTEs for 6 months (480 hours/month) | $66/hour | $152,064 |
| 18 (Ex. 107) | 3 FTEs for 6 months (480 hours/month) | $66/hour | $152,064 |
| 19 (Ex. 119) | 3 FTEs for 2 months (480 hours/month) | $66/hour | $60,000 |
| 20 (Ex. 123) | 3 FTEs for 2 months (480 hours/month) | $66/hour | $60,000 |
| 21 (Ex. 128) | 3 FTEs for 9 months (450 hours/month) | $66/hour | $147,551[2] |

---

[1] As discussed during trial, a number of these contracts have substantial typographical and mathematical errors. The government has listed the hourly figures that reconcile to the total contract price or invoice details, where possible. For example, SOW 19 & 20 state that OPTO shall provide "3 FTEs for 2 months (480 hours/month) to deliver performance tuning services. A total of approximately 320 hours." The SOWs then calculate the price as "$66 per hour x 320 hours per month = $31,680/month x 2 months = $63,360 for 2 months." In reality, $66/hour x <u>480</u> hours/month x 2 months = $63,360. A "pre-pay discount" then reduces the total contract price for SOW 19 & 20 to $60,000.
[2] This amount incorporates a deduction for an $85,000 "project" that OPTO was purportedly completing for Arrow.

In addition to the 21 fraudulent SOWs listed above, the defendant and Perlstein also negotiated additional "special projects" (Exs. 25–26) and caused Datavail to send OPTO two additional payments in 2019 without a corresponding SOW or invoice (Exs. 113 & 116.)  In total, Datavail paid OPTO $1,949,023 via interstate wire transfers.  (Ex. 161.)

During trial, Datavail's current CEO, Scott Frock, testified that he was unable to substantiate *any* work completed by OPTO or identify any OPTO employees or contractors completing work for Datavail.  This finding is consistent with OPTO's own tax returns which show that the company paid no salaries and did not issue Form 1099s to contractors.  (*See* Exs. 202–206, 534–536.)  Nonetheless, Perlstein personally delivered the SOWs and invoices to Datavail's accounting department and used his status and influence as Datavail's CEO to ensure that Datavail paid OPTO.

### (3) The defendant laundered funds to Perlstein through other business entities.

Between 2014 and 2018, the defendant laundered Perlstein's share of the fraud proceeds through All Health Marketing LLC, d/b/a Marketing Solutions & Communications ("MSC"), an entity controlled by "E.K.", Perlstein's then brother-in-law. Between 2014 and 2016, E.K. sent OPTO eleven false invoices for sales consulting services, totaling $357,920 (approximately ~50% of Datavail's payments to OPTO at the time).  (*See* Exs. 18, 23, 28, 34–35, 40, 45, 50, 56, 72, & 221.)  In reality, neither E.K. nor anyone else at MSC completed any services for OPTO.  Nonetheless, the defendant paid MSC via checks purportedly signed by the defendant's stepdaughter, and then E.K. transferred the bulk of the proceeds to Perlstein while retaining a portion

for himself.  (Exs. 186 & 224.)

After March 2016, E.K. stopped sending invoices to OPTO.  But the defendant (still using checks bearing his stepdaughter's signature) continued to pay MSC until March 2018.  (Ex. 224.)  Between July 2016 and March 2018, the defendant made eight additional payments to MSC totaling $341,992 without having received corresponding invoices for any purported services.  (Ex. 221.)  In total, the defendant paid MSC $699,912; of this amount, E.K. transferred $627,660 to Perlstein.  (Ex. 161.)

In 2018, Perlstein incorporated a new entity, PhysicalCloud LLC, which he thereafter used to receive his share of the fraud proceeds.  (Ex. 194.)  Although PhysicalCloud never issued OPTO a single invoice and never completed any services for OPTO, the defendant wrote seven checks totaling $376,500 to PhysicalCloud between September 2018 and October 2019.

**(4) The defendant retained $874,651 of fraud proceeds.**

OPTO retained $874,651 of the fraud proceeds.  As FBI Forensic Accountant Lindsay Fryer testified at trial, the defendant utilized the fraud proceeds to, among other things: make credit card payments (~$245,950), make payments on two BMWs (~$73,379), set up retirement accounts for himself and his wife (~$210,274[3]), pay taxes (~$188,281), and pay rent for an apartment (~$21,496).  (*See* Ex. 160.)

## II.    APPLICABLE SENTENCING GUIDELINES

### A.    Sentencing Guideline Calculation

---

[3] As of March 31, 2021, these accounts had grown to total over $330,000.  (Ex. 171 at 330 & 339.)

The government calculates the defendant's advisory guidelines range as follows:

1. The base guideline is § 2B1.1, with a base offense level of **7**. U.S.S.G. § 2B1.1(a)(1).

2. A **16-level enhancement** applies because the loss is more than $1,500,000 but less than $3,500,000. *Id.* § 2B1.1(b)(1)(I).

3. A **two-level enhancement** applies because the offense involved sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. *Id.* § 2B1.1(b)(10)(C).

4. A **two-level enhancement** applies because the defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense. *Id.* § 3B1.3.

5. A **two-level enhancement** applies because the defendant willfully attempted to obstruct or impede the administration of justice with respect to the investigation related to the instant conviction. *Id.* § 3C1.1.

6. The government anticipates that the defendant will be eligible for a "zero point offender" reduction. Assuming his eligibility, this will result in a **2-level reduction** pursuant to § 4C1.1.

7. The adjusted offense level is estimated to be **27**.

8. Based on information currently available to the United States, it is estimated that the defendant's criminal history category is I.

9. The career offender/criminal livelihood/armed career criminal adjustments would not apply.

10. The advisory guideline range resulting from these calculations is: **70 to 87 months'** imprisonment. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level estimated above could conceivably range from 70 months (bottom of Category I) to 162 (top of Category VI).

11. Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $25,000 to $250,000, plus applicable interest and penalties.

12. Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least one year, but not more than three years.

13. Pursuant to guideline § 5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses. This amount is currently estimated to be **$1,949,023.**

B.   **Applicable Sentencing Enhancements**

(1)   **§ 2B1.1(b)(10): The defendant used sophisticated means to execute the scheme.**

The Guidelines commentary states that "sophisticated means" includes "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1(b)(10), cmt. n.9(B). The Guidelines commentary further provides a list of non-exhaustive examples that may constitute "sophisticated means," including "[c]onduct such as hiding assets or transactions, or

both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.* Moreover, "[t]he Guidelines do not require every step of the defendant's scheme to be particularly sophisticated; rather ... the enhancement applies when the execution or concealment of a scheme, viewed as a whole, is 'especially complex or especially intricate.'" *United States v. Sutton*, 2024 WL 3549085, at *6 (10th Cir. July 26, 2024) (quoting *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010)).

In this case, the defendant incorporated OPTO, an entity which had no other clients and was used solely to receive fraudulent payments from Datavail. He thereafter used his stepdaughter's identity to hide his own involvement in the scheme. (*See* Ex. 3 (As the defendant wrote in an email to Perlstein: "[w]e can do direct to her or through S corp that [my accountant] can stand up so I do t [*sic*] exist.").) He then corresponded with Perlstein utilizing an email address bearing his stepdaughter's name, listed her as the signor in all SOWs, and completed numerous financial transactions in her name. After Datavail paid OPTO, the defendant first transferred Perlstein's portion through a separate company operated by E.K., Perlstein's brother-in-law, and later through Perlstein's own shell company, PhysicalCloud. Moreover, the defendant utilized his technical expertise to perpetrate the fraud: he and Perlstein chose to fraudulently bill Datavail for performance tuning services, a highly technical service that was particularly difficult to monitor and therefore lessened the likelihood that their fraud scheme would be detected.

Taken together, the defendant's actions to execute and conceal his involvement in the fraud constitute sophisticate means under § 2B1.1(b)(10)(C). *See United States*

*v. Milligan*, 77 F.4th 1008, 1013–15 (D.C. Cir. 2023) (affirming application of sophisticated means enhancement in wire fraud case where defendant impersonated a former employee and concealed her offenses by setting up an email address in former employee's name and using checks ostensibly authored by that former employee); *see also Sutton*, 2024 WL 3549085, at *6 (affirming application of sophisticated means enhancement where the defendant "exploited his information-technology expertise, as well as his inside knowledge of how the victim conducted his business and payments" to execute his fraud).

    **(2)    § 3B1.3: The defendant abused a position of private trust.**

Guidelines section 3B1.3 states: "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels." The Guidelines commentary clarifies that "public or private trust" refers to a position of trust "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." USSG § 3B1.3 cmt. n.1. Moreover, "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense . . .." *Id.*; *see also United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996) (explaining that the "primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong.").

When he was hired by Arrow, the defendant acknowledged that Arrow's conflict of interest rules prohibited him from "[d]oing work for, or getting paid by, a supplier,

customer or competitor of Arrow."[4]  (Ex. 134; *see also* Ex. 135.)  Despite this prohibition,

the defendant's entity received nearly $2 million from Datavail, with SOW 21 explicitly

referencing the notion that OPTO's work was purportedly to be completed on the Arrow

account.  (Ex. 128.)  Moreover, trial testimony established that the defendant utilized his

position at Arrow to control the business relationship with Datavail and negotiate SOW

11, which ultimately facilitated the defendant's subsequent fraudulent billing scheme

through OPTO.  (*See* Ex. 146 (defendant informed others within Arrow that SOW 11

would impact billing "coming through on my [Datavail] invoices").)  Perlstein also

testified that after they began their fraud, Arrow's complaints regarding Datavail's

services diminished.

Accordingly, as the executive who oversaw the performance tuning work

completed for Arrow's databases, the defendant was the individual in the best position

to track what work was being done (as well as conceal any work *not* being done) by its

suppliers/vendors.  The defendant took advantage of his position at Arrow to conceal

the fraud he was perpetrating using OPTO, as well as to manage Arrow's relationship

with Datavail.  He abused this position of private trust to enrich himself.

> **(3)      § 3C1.1: The defendant obstructed justice through his production of false invoices during the investigation.**

Section 3C1.1 authorizes a two-level enhancement where the defendant "willfully

obstructed or impeded, or attempted to obstruct or impede, the administration of justice

with respect to the investigation, prosecution, or sentencing of the instant offense of

---

[4] Dan Bergeron agreed during trial that Datavail is an Arrow supplier.

conviction . . . ."  The Guidelines commentary states that this adjustment applies when a defendant has "produc[ed] or attempt[ed] to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding[.]"  USSG § 3C1.1, cmt. n.4(C).

During the investigation, the government issued a subpoena to OPTO which directed the company to produce, *inter alia*, "[a]ll work orders and invoices to and from customers and vendors to include payment information."  In response, OPTO[5] produced twenty-five invoices directed to Datavail for purported performance tuning services or special development projects.  Significantly, Datavail—the purported recipient for these invoices—has no record of receiving six of the OPTO invoices.  Moreover, as set forth below, several of these OPTO invoices are materially different from the invoices that Datavail *did* receive and relied on in issuing payment to OPTO.

| OPTO Invoice Number | OPTO Invoice Date | Amount | Inconsistencies |
|---|---|---|---|
| 10001 (Ex. 17) | 1/17/2014 | $69,994 | Datavail has no record of receiving this invoice. |
| 170001 (Ex. 112) | 1/3/2019 | $60,000 | Datavail has no record of receiving either a statement of work or any invoice for this $60,000 payment to OPTO.<br><br>This invoice double bills for performance tuning services already included in Invoice 169071 (dated 9/10/2018, associated with Statement of Work No. 18, Ex. 108).  This invoice has material discrepancies from other OPTO invoices as well: it utilizes a $54 hourly rate instead of the $66 hourly rate used in Invoice 169071; bills fewer hours than normal (1,112 hours total for three |

[5] The subpoena response was transmitted by the defendant's attorney.  However, as established during trial, the defendant incorporated and controlled OPTO.

| | | | months, instead of 480 hours/month); and lists a $48 discount as compared to the percentage-based discount used in other invoices. This invoice date matches the date that the $60,000 was deposited in OPTO's bank account.  (*See* Ex. 180 at 19.) |
|---|---|---|---|
| 170002 (Ex. 115) | 2/19/2019 | $85,000 | Datavail has no record of receiving either a statement of work or any invoice for this $85,000 payment to OPTO.<br><br>Moreover, this invoice is dated four days *after* Datavail initiated the $85,000 payment to OPTO. (*Compare* Ex. 115 *with* Ex. 117.)  The invoice date, however, matches the date that the funds were deposited into OPTO's bank account.  (*See* Ex. 180 at 23.) |
| 185000 (Ex. 121) | 4/17/2019 | $60,000 | Datavail has no record of receiving this version of an OPTO invoice for its $60,000 payment.<br><br>This invoice does not match either the invoice that Datavail has in its files which triggered payment to OPTO (Invoice No. 169085, Ex. 120) or the description of the services set forth in SOW 19 (Ex. 119).  The OPTO-version of the invoice differs from the Datavail-version in several material respects, including its date, invoice number, rate, quantity of hours, months covered, and discount.  The date listed on the OPTO-version of the invoice, however, matches the date that the funds were deposited into OPTO's bank account.  (*See* Ex. 180 at 39.) |

| 186000 (Ex. 125) | 5/21/2019 | $60,000 | Datavail has no record of receiving this version of the invoice for this $60,000 payment to OPTO. |
|---|---|---|---|
| | | | This invoice does not match either the invoice that Datavail has in its files (Invoice No. 201856, Ex. 124) or the description of the services set forth in SOW 20 (Ex. 123). The OPTO-version of the invoice also differs from the Datavail-version in several material respects, including its date, invoice number, rate (fixed versus hourly), months covered, and discount. Notably, this invoice is dated *after* the funds were wired by Datavail to OPTO. (*Compare* Ex. 125 *with* Ex. 126.) However, it matches the date that funds were deposited into OPTO's bank account. (*See* Ex. 180 at 45.) |
| 187000 (Ex. 130) | 9/9/2019 | $147,551 | This invoice does not match either the invoice that Datavail has in its files (Invoice No. 201856, Ex. 129) or the description of the services set forth in SOW 21 (Ex. 128). The OPTO-version of the invoice also differs from the Datavail-version in several material respects, including its date, invoice number, hourly rate, quantity of hours, months covered, and discount. Notably, this invoice is dated *after* the funds were wired by Datavail to OPTO and *after* the date that funds were deposited into OPTO's bank account. (*Compare* Ex. 130 *with* Ex. 131 and Ex. 180 at 69.) |

The government has been unable to identify any contemporaneous record of these six invoices being transmitted by OPTO to Datavail (or anyone else) during the fraud scheme. Datavail has no record of these invoices, even though these invoices list Datavail as the intended invoice recipient. Given the material inconsistencies between these invoices and the invoices that were submitted to Datavail and were used by Datavail to initiate payment to OPTO, it appears that these six false invoices were generated after the fraud scheme came to light for the purpose of responding to

OPTO's subpoena during the government's investigation. Moreover, all the invoices submitted by OPTO to the federal government during its investigation were false insofar as they bill for performance tuning services that were not rendered.

Courts around the country have applied the two-level enhancement set forth in § 3C1.1 where a defendant submitted false records in response to a subpoena, regardless of whether the false documents materially misled authorities. *See, e.g.*, *United States v. Wardell*, 218 F. App'x 695, 702 (10th Cir. 2007) (recognizing that altered document did not have to materially mislead federal authorities in order for the obstruction of justice enhancement to apply to defendant's submission of altered document); *United States v. Panko*, 795 F. App'x 727, 733 (11th Cir. 2019) (affirming obstruction enhancement based on falsified restaurant ledger that defendant produced in response to subpoena, where the ledger reflected "an intent to portray retroactively the large debit card transactions as legitimate restaurant income, in contrast with the much lower receipts that [defendant] contemporaneously reported to the IRS"); *United States v. Harris*, No. 23-6811, 2025 WL 18131, at *2 (2d Cir. Jan. 2, 2025) ("district court's findings that [the defendant] knowingly sent false documents to the DEA in an attempt to explain away and re-acquire evidence of his crimes was more than sufficient to establish his intent to obstruct justice"); *United States v. Filippi*, 172 F.3d 864, at *3–4 (4th Cir. 1999) (affirming application of § 3C1.1 enhancement where defendant created the false corporate records in an effort to avoid tax consequences flowing from the mail fraud offense); *United States v. Luca*, 183 F.3d 1018, 1022–23 (9th Cir. 1999) (affirming application of § 3C1.1 enhancement where district court determined that the defendant

had intentionally submitted false prospectuses in response to an investigative subpoena).

As such, the government respectfully contends that the Court should enhance the defendant's guidelines range by two levels pursuant to § 3C1.1.

## **GOVERNMENT'S SENTENCING RECOMMENDATION**

During sentencing, the Court must calculate the sentencing range recommended by the United States Sentencing Guidelines and consider the sentencing factors set forth in 18 U.S.C. § 3553(a).  *See United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018).

The Sentencing Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate" to carry out the statutory sentencing purposes reflected in Section 3553(a).  *Rita v. United States*, 551 U.S. 338, 349 (2007).  Section 2B1.1 represents the Sentencing Commission's sound policy judgment that white-collar crimes are serious offenses, and the sentences for those crimes must be calibrated to promote respect for the law.  Significantly, "the sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses."  *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009).

Consistent with its view that a guideline sentence provides a "rough approximation" of sentences that will achieve § 3553(a)'s objectives, *Rita*, 551 U.S. at

350, the government respectfully submits that a guidelines sentence of 78 months' imprisonment appropriately balances the § 3553(a) factors, particularly the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the crime and deter future criminal conduct.

### A. Nature and circumstances of the defendant's offenses

The defendant's crimes were calculated, sophisticated, extensive, and repeated. This was not an isolated error in judgment, but a series of deliberate choices spanning more than six years and 21 false statements of work. As demonstrated at trial, the defendant established OPTO, which was utilized for the sole purpose of obtaining fraudulent proceeds from Datavail. As a result of the defendant and Perlstein's conduct, Datavail paid OPTO $1,949,023, of which the defendant pocked $874,651 (~44.88% of the proceeds). After receiving his cut of the fraud proceeds, the defendant used the bulk of these funds to generate investment accounts for himself and his wife, repay his credit cards, and purchase BMWs. (*See* Ex. 160.)

But it's not just about the money. The defendant also made the deliberate choice to exploit his *then-teenage stepdaughter* to conceal his own involvement in the fraud. He established an OPTO email account in her name, assumed her identity when communicating about his fraud, signed checks and contracts in her name, and directed her to sign one check and one SOW. The nature and circumstances of the defendant's offense warrants a sentence of 78 months' imprisonment.

**B. The defendant's history and characteristics support the recommended sentence.**

It was not this 52-year-old defendant's lot in life that led him to commit his crime. It was greed. Contrary to the personal histories often before the Court, the defendant appears to have the benefit of a supportive family and substantial career opportunities. It is undisputed that the defendant is a remarkably talented performance tuner who was critical to Arrow's operations. At the same time as he was engaging in fraud, he also earned numerous promotions, strong performance reviews, and was awarded sizeable financial bonuses. (*See, e.g.*, Exs. 147–148, 506, 508, 512–513, 519–520, 523.) The fact that the defendant chose to commit this fraud despite ample opportunities to make legitimate income weighs in favor of a guidelines sentence. As the Seventh Circuit has recognized, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

**C. The recommended sentence is necessary to promote respect for the law and afford specific and general deterrence.**

The government respectfully submits that a custodial sentence of 78 months' imprisonment is necessary to promote general deterrence and respect for the rule of law. After all, courts have repeatedly recognized that general deterrence can have a pronounced effect in the context of white-collar crime as individuals often make calculated determinations about the potential reward and the likelihood that they will face a significant sanction if caught. *See, e.g.*, *United States v. Sample*, 901 F.3d 1196,

1200 (10th Cir. 2018) (recognizing that "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment" (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013))); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013))). Indeed, in adopting the § 3553 sentencing factors, Congress "emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

As the Court heard during trial, the defendant's criminal acts were far from victimless crimes. In addition to the financial cost associated with the defendant's fraud, the defendant's actions carried additional collateral consequences. Ultimately, Arrow dropped Datavail as a client. This forced Datavail to lay off numerous employees, and both Datavail and Arrow have undoubtedly incurred substantial legal and reputational costs as well. Accordingly, the government respectfully submits that the defendant's sentence should demonstrate that those who engage in fraud will be punished. Moreover, his sentence should promote respect for the rule of law and provide adequate deterrence to criminal conduct. Only a significant term of imprisonment will prevent this type of crime from recurring generally and ensure the defendant has no desire to engage in further criminal activity.

Respectfully submitted this 12th day of June, 2025.

J. BISHOP GREWELL
Acting United States Attorney

By:     */s/ Nicole Cassidy*
Nicole C. Cassidy
Bradley W. Giles
Assistant United States Attorneys
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bradley.Giles@usdoj.gov
Nicole.Cassidy@usdoj.gov
Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2025, I electronically filed the foregoing **GOVERNMENT'S SENTENCING STATEMENT AS TO DEFENDANT MICHAEL VERGATO** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all e-mail addresses of record.

By: */s/ Melanie LeaRussa*
Melanie LeaRussa
Legal Assistant
United States Attorney's Office